**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**JOHN A. KING,**

       **Plaintiff,**

*vs*.                          **Civil Action No.  1:09cv15**

**LANCE ROLLO, individually**
**and in his official capacity as Attorney at Law,**

       **Defendant.**

## OPINION/REPORT AND RECOMMENDATION

On January 28, 2009, Plaintiff, John A. King ("Plaintiff"), proceeding *pro se*, filed a lawsuit against Defendant Lance Rollo ("Defendant"), claiming negligence/legal malpractice and breach of contract. Plaintiff sought compensatory damages in the amount of $25,000,000.00 (Twenty-Five Million Dollars) along with punitive damages in the amount of $25,000,000.00 (Twenty-Five Million Dollars), as well as costs, attorney fees, interest, prejudgment interest and any further such other relief to which he may be entitled.

On May 21, 2009, Defendant was served with the Summons and Complaint in this matter.

On June 9, 2009, Defendant filed his Answer to the Complaint.

On August 21, 2009, the Court entered its First Order and Notice Regarding Discovery and Scheduling, setting deadlines for the Initial Planning Meeting as September 22, 2009; Report Filing Date as October 6, 2009; and Initial Discovery Disclosures as October 22, 2009. A Scheduling Conference was set for October 29, 2009. The Order was mailed to Plaintiff at his address of record in the case.

On September 24, 2009, the Order mailed to Plaintiff at his reported address was returned

as undeliverable.

On September 25, 2009, Defendant filed a Report and Proposed Discovery Plan. In the Report Defense counsel represented to the Court: 1) that he had attempted to contact Plaintiff via correspondence dated September 1, 2009, asking that Plaintiff contact counsel to jointly set a time to conduct the ordered meeting; 2) on September 8, 2009, Plaintiff telephoned counsel and informed him that he was attempting to obtain "lead counsel," that he should have lead counsel confirmed in two or three days, and that he would then contact counsel to schedule the planning meeting; 3) not having heard from Plaintiff or any attorney on his behalf, Defense counsel again contacted Plaintiff, requesting Plaintiff or his attorney contact him to schedule the planning meeting, as had been ordered by the Court; and 4) that as of September 25, 2009, the date Defense counsel filed the Report, Plaintiff had failed to make any contact.

Defendant filed his Rule 26(a)(1) Initial Disclosures, as ordered, on October 22, 2009.

On October 23, 2009, the day after his Initial Disclosures were due, Plaintiff wrote a letter to the Clerk of Court attaching documents to be filed including "Plaintiff's interrogatories to defendant" and "Requested documents to be produced at deposition." Significantly, the return address was identical to the address used by the Court to mail the Initial Scheduling Order, which had been returned as undeliverable. The Clerk re-mailed the Initial Scheduling Order to the same address.

On November 2, 2009, the Honorable Irene M. Keeley, United States District Judge entered an Order staying further action in the case, "[d]ue to King's failure to comply with the local rules of this Court, and its explicit orders . . . ." The Court noted that the failure of Plaintiff to receive his

Certified mail was that he had failed to pick it up. The Court noted that at the time of the Order, Plaintiff had further failed to pick up the second mailing of the Initial Scheduling Order. Perhaps more significantly, the Court noted Plaintiff failed to attend the Scheduling Conference held on October 29, 2009, despite receiving notice. At the conclusion of the Order, the District Judge Ordered Plaintiff to bring himself into full compliance with this Court's orders and warned that, should he fail to do so, the Court would enter an Order to Show Cause why the case should not be dismissed for failure to prosecute. (Citing Link v. Wabash R. Co., 370 U.S. 626 (1962)(stating that a Court has the inherent power to *sua sponte* dismiss a case for failure to prosecute where plaintiff's counsel failed to appear at a scheduled pretrial conference)).

On November 19, 2009, Plaintiff filed an "Affidavit of Compliance of Issuance of Interrogatories to Defendant, Lance Rollo," stating that he had served a set of Interrogatories on Defendant on October 20, 2009, and that he intended to continue serving discovery upon the defendant. He also requested a deadline of December 10, 2009, to secure an attorney. This filing had a different address than the previous filings. The Clerk noted that it had also received a green card for Plaintiff's receipt of mail at the previous address.

On November 25, 2009, Judge Keeley entered an Order Scheduling a Show Cause Hearing, concluding that Plaintiff failed to fully comply with the Court's November 2, 2009 Order. The Order scheduled the hearing for December 17, 2009, in order for Plaintiff to "show cause, if he can, why he should not be sanctioned, including possible dismissal of his case, by this Court for his failure to comply with its orders. Subsequently, the District Judge instructed the Clerk to send copies of filings to Plaintiff via email, regular US Mail, and certified mail.

At the Show Cause hearing on December 17, 2009, Plaintiff, still proceeding *pro se*, appeared in person. District Judge Keeley found Plaintiff "failed to provide a reasonable explanation for his prior failures to comply with the Federal Rules of Civil Procedure, as well as the Court's local rules and prior orders." Accordingly, the Court sanctioned Plaintiff for his non-compliance by imposing a fine of $1,000 and Ordered that he could not proceed with the case until he paid the fine and provided his exact mailing address and email address.

The Court directed the parties to file an initial Rule 26(f) planning report by January 28, 2010, and noted the Court would schedule a scheduling conference by separate order.

Plaintiff paid the $1,000 fine on January 25, 2010. That same day, only three days shy of one year from the date he filed his Complaint in this Court, he also finally filed his Initial Rule 26(a)(1) disclosures.

On January 26, 2010, two days shy of one year from the date Plaintiff filed his Complaint, the parties filed their Joint Planning Report. Notably, the parties agreed that the last date to conduct discovery would be October 1, 2010; Plaintiff's expert disclosure would be due August 1, 2010; dispositive motions be filed on or before December 1, 2010; and trial be conducted in early March 2011.

On February 2, 2010, the Court lifted the stay on this case and scheduled a Scheduling Conference for February 24, 2010. The parties attended the Scheduling Conference by telephone. Plaintiff was still proceeding *pro se.*

On February 26, 2010, the Court entered a Scheduling Order, with Plaintiff's expert disclosure due August 1, 2010; <u>Daubert</u> Motions October 15, 2010; a discovery deadline of

December 31, 2010; dispositive motions due January 14, 2011; pretrial conference May 26, 2011; and trial June 13, 2011.

On March 1, 2010, attorney John W. Hart filed a Notice of Appearance as counsel for Plaintiff, stating he would file his *Pro Hac Vice* paperwork by March 3, 2010.

On March 12, 2010, Defendant served his First Discovery Requests on Plaintiff.

On May 14, 2010, Defendant filed his Motion to Compel Discovery Responses and Deposition, noting that Plaintiff had failed to respond <u>in any manner</u> to the discovery requests.

On June 4, 2010, the undersigned United States Magistrate Judge, upon referral from the District Judge, entered an Order noting that attorney Hart had still not been admitted *pro hac vice*; nor had any other attorney made an appearance in this matter. The Court further noted there was no response to the discovery requests. The Court therefore ordered Plaintiff to show cause why his counsel had not complied with the Court's rules and why he had failed to follow through with his own representations to the Court that he would do so on or before March 3, 2010.

Attorney Hart filed the paperwork and filing fee to appear *pro hac vice* on June 10, 2010, and Greg Schillace filed notice of appearance as local counsel.

On June 14, 2010, the undersigned entered an Order Granting Defendant's Motion to Compel. Significantly, <u>no responses had as yet been filed by Plaintiff, and no Response to the actual Motion to Compel had been filed</u>. The Court found any and all objections to the discovery had been waived due to untimeliness; ordered full and complete responses on or before July 14, 2010; ordered Plaintiff to provide to Defendant dates for his deposition, to be taken before July 30, 2010; and directed counsel for Defendant to file an accounting of its costs and fees incurred in filing the

Motion to Compel.  Significantly, the Court expressly noted:

> Plaintiff has already been sanctioned by this Court for failure to prosecute.  Plaintiff is advised that pursuant to Fed. R. Civ. P. 37(b) and 37(d)(3) sanctions for failure to comply in full with this Court's orders or to further delay this matter by unreasonable failure to cooperate with Defendant's counsel in resolving discovery matters shall result in further sanctions which may include any of the sanctions available to the Court <u>up to and including dismissal of the action</u>.

The Court directed Defendant to file his accounting on or before June 30, and Plaintiff to file objections within 14 days of service.

On June 17, 2010, Defendant field and served his Motion of Attorney Fees and Expenses.

On July 1, 2010, Defendant filed Notice of Deposition of Plaintiff.

There was no response from Plaintiff to the Motion for Attorney's fees.

On July 14, 2010, the Court granted  the Motion for attorney fees and Ordered Plaintiff to pay Defendant $681.59 within 20 days.

Plaintiff, through counsel, paid the ordered fees and expenses on July 26, 2010.

On August 31, 2010, 19 full months after Plaintiff filed his Complaint in this Court, Defendant filed another Motion to Compel Complete Discovery Responses and to Amend Scheduling Order.

On September 3, 2010, the Court granted the Motion to Compel.  While the Order speaks for itself, the Court notes the following chronology, once again.  According to Defendant's motion, the parties agreed that Plaintiff would supplement his discovery responses no later than August 15, 2010, and would appear for a deposition no later than August 31, 2010.  On Friday, August 13, 2010, Plaintiff's counsel left a voice mail message for Defendant's counsel stating that the

supplementations, including executed releases for social security earnings information and federal tax returns would be forthcoming August 16, 2010.  According to Defendant's counsel as of August 19, 2010, she still had not received the promised supplementation.  On August 23, 2010, however, Plaintiff's counsel sent email correspondence advising that a death in his wife's family required his absence from the office, but supplementation would be forthcoming in the next two days.  Finally, the parties agreed the responses would be supplemented by August 27, 2010.  On that date, counsel received copies (not originals) of the executed releases, but no additional supplementation.  At the close of business August 30, 2010, counsel had still not received the supplemental responses or the originals of the executed releases.

The Court amended the Scheduling Order with the express exception of the deadline for Plaintiff's expert disclosure, which, as the Court stated, had long since passed without any request for enlargement.  The Court found Plaintiff had waived his right to utilize an expert in this case.  No objection was ever filed to the Order.

On September 15, 2010, the Court held yet another hearing regarding the same discovery propounded by Defendant six months earlier.  The Court memorialized its oral Order on September 16, 2010, ordering Plaintiff, within 30 days, to pay Defendant the sum of $476.70.  The Court notes this was the third actual sanction of Plaintiff.  The Court also again ordered Plaintiff to provide full and complete responses to the March discovery requests.  Significantly, the Court stated:

> The Court at this time DENIES Defendant's request for further sanctions but once again warns that if Plaintiff continues in his failure to comply with the scheduling order or this Court's Orders, the Court will consider seriously further sanctions, up to and including recommending dismissal of this action.

(Emphasis added).

On October 25, 2010, Defendant filed the current Motion for Sanctions or, in the Alternative Motion to Compel. Defendant argued that despite the Court's previous orders, Plaintiff had yet again failed to completely respond to the March Discovery Requests. Further, Plaintiff had failed to pay the attorney's fees and costs ordered by this Court on September 16, 2010.

On November 1, 2010, Plaintiff, through counsel, filed his Rule 26(a)(2) Disclosure of Experts, despite this Court's express ruling that he had waived any expert by his failure to timely disclose.

On November 2, 2010, Defendant filed a Motion to Enforce the September 3, 2010 Order, moving the Court to strike Plaintiff's late-filed and expressly disallowed expert disclosure.

On November 4, 2010, Plaintiff filed his Response in Opposition to Defendant's Motion for Sanctions, or in the alternative, Motion to Compel.

On November 10, 2010, Defendant filed his Reply in support of his Motion for Sanctions.

On November 15, 2010, Plaintiff filed his Response in Opposition to the Motion to Enforce Judgement and Strike Plaintiff's Expert Witness Disclosure.

On November 17, 2010, Defendant filed a Motion to Compel Full and Complete Responses to Defendant's Second Set of Requests for Production of Documents. No Response to the Motion to Compel was ever filed.

On November 29, 2010, Plaintiff filed and served his First Discovery Requests.

On November 29, 2010, Plaintiff served responses to Defendant's Second Set of Discovery requests. Notably, even if complete, these responses were filed weeks late, after Defendant had been

forced to file yet another Motion to Compel. Plaintiff had therefore waived any objections to the discovery requests.

On December 1, 2010, Defendant served his Expert Witness Disclosure.

On December 3, 2010, the undersigned granted Defendant's Motion to Enforce the September 3, 2010 Order and to Strike Plaintiff's proposed expert. Plaintiff filed objections to this Order on December 17, 2010, and Defendant filed his Reply on December 20, 2010.

On December 22, 2010, the Court granted Defendant's Motion to Compel. No Response had been filed. The Court directed Defendant to serve and file an accounting of his costs and fees expended in filing the Motion to Compel. Plaintiff was afforded the opportunity to object to the claimed costs and expenses.

On December 28, 2010, Defendant filed and served his accounting of costs expended in pursuit of the Motion to Compel. No objection was ever filed by Plaintiff.

On January 4, 2011, Plaintiff served Responses to Defendant's Second Request for Production of Documents.

On January 14, 2011, the Court granted Defendant's costs and fees pursuant to the filing of his Second Motion to Compel. The Court Ordered Plaintiff to pay $1,005.80 as the reasonable costs and fees incurred in the preparation and filing of the Motion to Compel.

The Court also Ordered Plaintiff to pay Defendant $583.00 as the reasonable costs and fees incurred in re-addressing the discovery issues during the September 15, 2010 hearing.

In its January 14, 2011, Order, the Court expressly noted that there was no evidence Plaintiff had ever paid the $476.70 in fees and costs the Court Ordered paid by October 15, 2010, and

Defendant, in fact, represented to the Court that Plaintiff had not paid the ordered costs and fees.

Meanwhile, the Court notes it has been two years since Plaintiff filed his Complaint in this Court and discovery is not nearly completed. Plaintiff objected to any further deposition, despite the Court's having allowed for more time for a deposition after Plaintiff produced more discovery responses. In fact, Defendant had requested the Court enlarge the time for him to take Plaintiff's deposition due to the lack of discovery responses; however, the Court felt the deposition might allow Defendant at least some discovery and ordered it go on as scheduled, expressly allowing Defendant to request a second deposition if necessitated by the lack of discovery.

A review of the docket as of January 25, 2011, indicates Plaintiff has failed to pay the $476.70 in attorney's fees and costs ordered on September 16, 2010, four months ago. Nor has Plaintiff offered any explanation for his failure to do so. The Court can therefore only conclude that the failure to obey this Court's explicit Order was willful.

The Court has already granted Defendant's Motion to Compel Responses to the Second set of Requests for Production of Documents, noting Plaintiff had again never responded to the Motion to Compel, and that Plaintiff's Responses to the Requests, even if complete, were weeks late. The Court has nevertheless reviewed the Discovery Requests and Responses. Defendant requested the following documents (paraphrasing the original requests). Defendant expressly requested that where any documents was, but no longer is, in Plaintiff's possession or control, or is no longer in existence, Plaintiff state whether the document was: 1) missing or lost; 2) destroyed; 3) transferred voluntarily or involuntarily to others, and, if so, to whom; or 4) otherwise disposed of.

Plaintiff's late responses are quoted verbatim:

1.      Any documents submitted by Plaintiff to any person in an effort to seek employment or obtain an agreement to provide professional services between 2003 and the present.

RESPONSE:   The Plaintiff has no such documents.

2.      Any versions of a resume previously or currently used by Plaintiff to seek employment between 2003 and the present.

RESPONSE:   The Plaintiff has no such documents.

3.      Any documents submitted by Plaintiff to any licensing board seeking reinstatement or renewal of his license to practice medicine since 2003.

RESPONSE:   The Plaintiff has no such documents and he did not retain any copies.

4.      Any documents submitted by Plaintiff seeking permission to take the bar examination in order to practice law in any state.

RESPONSE:   The Plaintiff states that he has never had any such documents.

5.      Any calendar maintained by Plaintiff since 2003.

RESPONSE:   The Plaintiff has not retained any copies.

6.      Any documents exchanged between Plaintiff and Angela Weir (an Alabama attorney who attended the hearings in which Plaintiff voluntarily dismissed the underlying actions) concerning those underlying actions.

RESPONSE:   The Plaintiff has no such documents.

7.      Any documents exchanged between Plaintiff and Phillip Haddad ( a local attorney involved in the underlying actions) concerning those underlying actions.

RESPONSE:   The Plaintiff has no such documents.

8.	Any documents exchanged between Plaintiff and Richard Poff (lead counsel in the underlying actions), concerning the underlying actions.

RESPONSE: See attached documents.

9.	Any documents exchanged between Plaintiff and Henry Walker concerning the underlying qui tam action.

RESPONSE:	The Plaintiff has no such documents.

10.	Any documents that were allegedly withheld in the peer review proceedings regarding the suspension of Plaintiff's privileges at Putnam General Hospital as described by Plaintiff throughout his deposition.

RESPONSE:	The Plaintiff has no such documents.

11.	Any documents that, in 2005, revealed the alleged fraud committed by Steptoe & Johnson, PLLC, as described by Plaintiff during his deposition.

RESPONSE: See Exhibits attached to Complaint.

12.	Any billing statements generated from the medical services provided by Plaintiff while working as a physician in Putnam County, WV.

RESPONSE: See attached documents.

The responses are clearly not sufficient, in that Plaintiff does not even attempt to address the inquiry as to whether he ever had such documents and, if so, what had happened to them? The Court finds Defendant is clearly prejudiced in his ability to locate any such documents.

Plaintiff responded similarly to Defendant's first discovery requests, stating that he did not have many of the requested documents. Plaintiff also failed to sign any authorizations in order that

Defendant could obtain the requested documents himself.  In fact, in Plaintiff's Response to the Motion for Sanctions, he states he has provided Defendant with all the documents he has, and that he had not retained documents since he had moved many times in the past eight years.  Regarding Defendant's attempt to obtain the documents from other parties which may have retained them, Plaintiff goes on to state:

> There is no requirement in the Federal Rules of Civil Procedure for a party to execute any form of release of information.  The Defendant may, if he chooses, issue a subpoena duces tecum for the requested information.

Regarding the fee he alleges he paid to Defendant for legal services, a fact at issue in this case, Plaintiff states he testified he paid Defendant $15,000.00, however:  "He simply has no documents in his possession . . . . Presumably, the Defendant knows how much money he received and he may even have documents related to the payment."  This response strikes the Court as flippant at best, and contemptuous at worst.

The Court finds it significant that Plaintiff was weeks late in responding to the discovery requests, only then to respond for the most part simply that he did not have the documents and was not required to sign an authorization for Defendant to obtain the documents.

Plaintiff represents to the Court that the Court should not sanction him for his clearly callous disregard of the Court's orders because:  "The ultimate effect of these responses is that it will be more difficult for the Plaintiff to prove his case before this Court."  While the Court finds this is accurate, Plaintiff disregards the obvious fact that his continuous delay in even advising Defendant that he did not have responsive documents has prejudiced Defendant in defending against the claims

made by Plaintiff.

This case was brought by Plaintiff. This case is now two years old. It is set for trial in less than five months. The discovery deadline has already been extended. The deadline for dispositive motions has already been extended, and the new deadline is less than six weeks away, yet Defendant does not have complete discovery responses to requests some of which were filed 10 months ago. Defendant does not have the simplest documents, such as any evidence that Plaintiff even paid Defendant to represent him.

Based on all of the above, the Court finds that Plaintiff has continuously failed to obey not only the Federal Rules of Civil Procedure, the Local Rules of Civil Procedure, the Court's Scheduling Order, but also this Court's direct Orders. Pursuant to Fed.R.Civ.P. 37(b)(2)(A), penalties for such failure include:

(1) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the actions, as the prevailing party claims;

(2) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;

(3) striking pleadings in whole or in part;

(4) staying further proceedings until the order is obeyed;

(5) dismissing the action or proceeding in whole or in part;

(6) rendering a default judgment against the disobedient party;

(7) treating as contempt of court the failure to obey any order except an order to submit to physical or mental examination.

It must be noted that the District Judge already used Rule 37(b)(2)(A)(4) to stay further proceedings until Plaintiff complied with the rules and Court's order with respect to the initial planning meeting. While the District Judge's action appeared to have immediate effect, it has not had any lasting impact on Plaintiff's conduct in this case. Thereafter, this Court had to sanction Plaintiff $1,000.00 for failure to prosecute, which was paid. The Court subsequently awarded attorneys fees and costs in granting the original motion to compel in the amount of over $700.00 (which was paid). Neither of these court ordered sanctions seems to have affected Plaintiff's behavior in regard to the inexcusable delay of these proceedings and disregard of the Court's orders. The undersigned finds Plaintiff has willfully failed or refused to pay the $476.70 ordered by the Court four months ago without any explanation. Since that time the Court has sanctioned Plaintiff an additional $583.00 and $1,005.80, respectively. Further, the Court explicitly and clearly warned in its last order (as well as all previous orders going back to Judge Keeley's original sanction for failure to prosecute) that failure to comply in full with this Court's Orders or to further delay this matter by unreasonable failure to cooperate "shall result in further sanctions which may include any of the sanctions available to the Court up to and including dismissal of the action." It is noted that the delay also compelled the Court to grant an extension of the scheduling order.

The Court therefore finds monetary sanctions have no effect on Plaintiff's noncompliance with Court orders or his responsibility to cooperate in discovery.

Pursuant to Federal rule of Civil Procedure 37(b)(2)(C), if a party "fails to obey an order to provide or permit discovery . . . the court in which the action is pending may . . . [render] a judgment by default against the disobedient party." In Mutual Federal Savings and Loan Ass'n. v. Richards

& Associates, Inc., 872 F.2d 88 (4th Cir. 1989), "after repeated, largely unsuccessful efforts to obtain pertinent and adequate discovery information" the District Court granted judgment by default against the defendants. On appeal, the Fourth Circuit noted the District Court's application of the four-part test recognized in Wilson v. Volkswagen of America, Inc., 561 F.2d 494 (4th Cir. 1977), cert. denied, 434 U.S. 1020, 98 S.Ct.744 54 L.Ed.2d 768 (1978), as follows: (1) whether the noncomplying party acted in bad faith; (2) the amount of prejudice his noncompliance cause his adversary, which necessarily includes an inquiry into the materiality of the evidence he failed to produce; (3) the need for deterrence of the particular sort of noncompliance; and (4) the effectiveness of less drastic sanctions. The Fourth Circuit further noted:

> Such an evaluation will insure that only the most flagrant case, where the party's noncompliance represents bad faith and callous disregard for the authority of the district court and the rules, will result in the extreme sanction of dismissal or judgment by default . . . . In such cases, not only does the noncomplying party jeopardize his or her adversary's case by such indifference, but to ignore such bold challenges to the district court's power would encourage other litigants to flirt with similar misconduct . . . .

(internal citations omitted).

Applying the four-factor test to the case at bar, the undersigned finds:

1) Plaintiff has acted in bad faith. Plaintiff has not responded to any of the discovery requests in a timely manner. He has responded, if at all, weeks late. The untimely responses continue to be insufficient ten months after the first discovery requests were made. No requests for extension of time were made to respond to the requests. Yet the responses, when finally served, consist mostly of simple denials that Plaintiff has any of the information requested. The undersigned can see no reason Plaintiff, if truthful about not having any of these documents, would not have

known that months ago. He also for months refused to sign authorizations for Defendant to get the information through other sources. He failed to even respond to the Motions to Compel in order to provide this Court with explanations for the delay and insufficiency of his responses. He has willfully disregarded this Court's orders to fully respond to the discovery, and willfully failed to pay reasonable Court-ordered fees and costs to which he did not object, without explanation.

In particular, the undersigned finds the Plaintiff's response to the request regarding the fee he alleges he paid to Defendant, that "Presumably, the Defendant knows how much money he received and he may even have documents related to the payment" is contemptuous of Defendant, the process, and this Court. His failure to pay fees ordered by the Court similarly shows his contempt for this court. Significantly, Plaintiff has not only an M.D., but a J.D. and an L.L.M. Although Plaintiff claims he is not a practicing attorney, his J.D and L.L.M. degrees speak volumes with regard to his legal knowledge and training.

Also the undersigned finds Plaintiff's responses during his deposition were often nonresponsive. For example, Defense Lead Counsel Steve LaCagnin showed Plaintiff an Exhibit entitled "Findings of Fact, Ultimate Findings of Fact, Conclusions of Law and Order" issued by the State of Indiana before the Medical Licensing Board of Indiana. Exhibit A at p. 117. Plaintiff responded that the document was correctly identified by counsel, but then argued with Defendant's counsel for not also presenting him with his appeal of that Order. When asked if the Order concluded that he had fraudulently misled the Medical Licensing Board of Indiana when he applied, Plaintiff again stated: "That was refuted, as I said. You don't have the appeal." The following colloquy then took place:

Q.   So the licensing board in the State of Indiana was trying to make you look like you were a bad person?

A.   Sure, just like you are. That's your job. That's what you're getting paid for from the insurance carrier . . . .

Q.   It says here that you presented no evidence or witnesses in defense after the conclusion of the State's presentation of evidence, doesn't it? Paragraph 13.

A.   Paragraph 13 . . . [perusing]

     Yeah, we - - that's what I'm saying. You don't have the full picture. You don't have the appeal that was submitted to –

Q.   That's what it says, doesn't it?

A.   Like I said, I could say you're having sex with Wendy [Adkins, Defendant's co-counsel] out there on the front steps - -

Q.   As I said - -

A.   Down at the Clarksburg Courthouse . . . .

Q.   Sir, if you're going to remain nonresponsive, we'll suspend this deposition, and we'll go before the Court.

A.   Well, that's what it says.

Q.   And stop making comments like you just made.

A.   Well, you're making comments that are not factual.

Q.   That is rude and it's unresponsive.

A.   Well, it's rude when you're saying that things are factual when it's actually not.

Q.     Is that what it says in paragraph 13, that you –

A.     Yeah, that's what it says.

 . . . .

Id. at 122-124.

    In another series of questions, these regarding Plaintiff's underlying case against McQueen and Murphy in the United States District Court of the Southern District of West Virginia, Plaintiff was similarly nonresponsive:

Q.     Ths suit brought by Mr. Poff was before you – against McQueen & Murphy . . . was before you retained Mr. Rollo; right?

A.     Right, and then Rollo had to sign on, and there is - - then I think it was Flaherty & Sensabaugh, and then there was – who was the other firm?

Q.     Well, the court dismissed it because of the statue of limitations issue?

A.     Right.  Well, Rollo had signed on the case, because he had to sign off on all the cases that were filed.

Q.     But the statute of limitations had already run, according to the court, before you had retained Mr. Rollo; right?

A.     On the McQueen & Harmon case, that's what the judge had ruled, but . . .

Q.     McQueen & Murphy?

A.     Yeah.  McQueen, Harmon & Murphy, I think is the full name of their law firm and - -

Q.     That's true, isn't it?  Hadn't that happened?

A.     Yeah, and - - but Rollo had signed off on that case to represent me.

Q.  After the statue of limitations had already run, tight?

A.  After it was determined by the court that the statutes had run, after.

Q.  The statute of limitations on that case had expired, had run its course, before you even retained Mr. Rollo. Whether he signed off on something after the fact or not, that statute had run before you retained him; correct?

A.  Yeah, and then the court scolded Mr. Rollo for not doing his homework to find out that the statute had actually run.

Q.  Well, Mr. Poff was the only attorney representing you at the time that the statue of limitations had run on that case; isn't that so?

A.  Yeah, and I filed an exhibit with the court after this revelation, after I was able to get on PACER and see what had happened of these people not fully revealing their activities and their deficiencies.

Q.  Well, that's all well and good, but that's not an answer to my question.

A.  Yeah, I'm sure you know all about that.

Q.  It's not an answer to my question. That's what I want, and that's what we're all here for today. So please answer the question. The statute of limitations - -

A.  Yeah, it was revealed by the court - -

Q.  Stop. I need to ask the question on the record without being interrupted. I want a clean record here. The statue of limitations had run at the time that only Mr. Poff was representing you; isn't that right?

A.  That was what was ruled by the court, yes.

Q.     Well, it's correct, isn't it?

A.     According to the court's opinion, yes.

 . . . .

Q.     The question that I'm asking you is: When the statue of limitations had run, and Mr. Poff

        filed the complaint, that was before you had even ever talked to Mr. Rollo; isn't that right?

A.     Well, the court ruled after the fact that Rollo was on board, and - -

Q.     That's no - -

A.     - - I disagree with the court.

Q.     That's not an answer to my question.

A.     I disagree with the court.

Q.     I didn't ask you that.

A.     Well, I'm not giving you the answer that you want.

Q.     The statute of limitations ran before you ever met Mr. Rollo in your case against - -

A.     - - According to the court . . . .

Id. at 265-271.[1]

        In yet another part of the deposition, regarding another case in the Southern District of West

Virginia against Steptoe & Johnson, LLC, et al., which Plaintiff voluntarily dismissed, the following

colloquy took place:

_____

        [1]The Report and Recommendation in 2:06cv121 (S.D.W.Va.), which was affirmed by
the District Judge clearly states that the case was dismissed due to the expiration of the statute of
limitations on July 29, 2005. The Complaint was filed on February 21, 2006, attorney Poff
requested *pro hac vice* without local counsel on February 28, 2006, which was denied, and
Defendant submitted his Notice of Appearance as Local Counsel on April 19, 2006.

Q. Now at some point in the hearing, you stepped outside with your lawyers.

A. Yeah, that's when Rollo threatened me that if I don't agree to dismiss this case, then I'm going to be faced with all these fines and sanctions and attorney's fees, kind of like what you're doing.

Q. Right. And so where did you go when you stepped outside the courtroom to discuss what you were going to do?

A. There was Farrell, there was Steve Farmer and the rest of those guys and Sensabaugh. It was far enough away from those people.

Q. And was Angela Wier [an Alabama attorney not admitted in West Virginia but present to support Plaintiff] there? Is that her name, Ware, Wier? Was she there with you and Mr. Rollo during that discussion?

A. She may have gone to the bathroom. I don't - - I don't recall if she was there or not.

Q. That was a pretty important discussion. You were deciding, weren't you, whether or not to dismiss your claims against Steptoe & Johnson with prejudice; right?

A. I was being blackmailed that I was going to be stuck with all this –

Q. That was an important discussion to you, wasn't it, sir?

A. Well I didn't know that Rollo was going to say, hey, listen - - (A), this is a total shock to me that this guy –

Q. Well, did you discuss any of this with Ms. Wier after Rollo said that to you, after she got back from the bathroom?

A. Afterwards - - I mean, I was in a no-win situation here. Here is Rollo, doesn't have any

intestinal fortitude to tell me beforehand, "oh, by the way, I forgot to tell you that I filed a motion to dismiss myself;" and that's what Stanley was upset with, that here, this guy is trying to jump off of a burning ship, where there is no absolute discovery, there is no interrogatories, there is nothing, and these guys just took my money and went to the cleaners and took me there with them.[2]

. . . . .

Q.    Now, when he went out in the hall with you, and he's told you he had filed this motion to dismiss and he was urging you to approve it –

A.    No he wanted me to dismiss the cases or be faced with these attorney's fees and sanctions and - -

Q.    Okay.

A.    - - everything else that you want to do to me as well.

Q.    And Ms. Wier was maybe in the ladies' room at that time, but when she came back out, in any event, did you discuss what had been suggested to you with her?

---

[2]A review of the docket in case 2:06cv122 (S.D.W.Va.) shows no filing by Defendant of a Motion to Withdraw.  Lead Counsel Poff did file a Motion to Withdraw, and was ordered to appear at a hearing on the matter but did not do so.  Defendant did appear, with Ms. Wier as new lead counsel for Plaintiff.  She, however, had not yet been admitted pro hac vice, so it was left to Defendant to act as sole counsel at the hearing.  There is no evidence he withdrew or even attempted to withdraw from the case.  Further, the stated grounds for the Motion to Dismiss were expressly:

> Dr. King is involved in on-going litigation as it relates to his employment at Putnam General Hospital. Information from said litigation may, at a later date, be useful in determining the merits of the above-styled action. However, it is the desire of the Plaintiff not to proceed further with this action at this time.

A.     Yeah.  Well, she said,  hey, you know, you're in a horrible jurisdiction.  You can't get any traction.  No one wants to hear the truth.  HCA is protecting their butts.  You got the Senate Majority leader and the Bureau Gonzales that want to bury your butt.   Everything I – you know, here you are.  You didn't have any of these cases being paid to you, paid to someone else, and they don't want to face the fines and penalties of the Corporate Integrity Agreement, and all these trial attorneys are coming after you, and you - -  You got no chance here.

Q.     So she agreed with Mr Rollo?

A.     Well, you know, it's - - here I am being blackmailed.

Q.     Did she agree with Mr. Rollo?

A.     No, she didn't agree with him, but I didn't have any money to pay all these guys to jack up their fees; and you know, they're billing the crap out of the insurance carrier for Sensabaugh and Farmer.  The all made millions of dollars off all that stuff in the last seven years, and so I can't compete with these guys.

Q.     Was Mr. Rollo asking you for more money out in the hallway?

A.     No, he didn't want any more money.  He just wanted to get off the burning ship, because he didn't do his job- -

Q.     Okay.  Did Ms. Wier - -

A      - - and Judge Stanley made that very apparent in the courtroom.

Q.     Did Ms. Wier urge you to agree to the dismissal?

A.     Yeah, you know, I – she said, well, you don't have any choice.  You don't have any choice

here.  You're going to be - -

Q.   So she told you you should do it?

A.   Well, you know, it was her opinion.  I don't have any money to pay these huge fines or sanctions to the court for all these guys that are, you know, jacking up whatever billable hours . . . .

Q.   Did you go back into open court and agree to the dismissal of your claims against Steptoe & Johnson?

A.   Um, agreed with my arm being twisted, yeah.  That I had no money to be facing painly [sic] sanctions and these fines for these people not doing their job . . .

Q.   Did you say anything to the court at the time that you were saying you agreed to dismiss Steptoe & Johnson, that - -

A.   No.  Judge Stanley was chewing on me like it's my fault that these guys didn't behave.  It's like it's my fault to police these guys . . . .

Regarding the third underlying case, also in the Southern District of West Virginia, the following colloquy took place:

Q.   And once again, you agreed in open court, on the record, to a voluntary dismissal with prejudice of your claims against Giatras & Webb; is that correct?

A.   With the persuasion of blackmail.

Q.   Okay.  Did you discuss again with Angela Weir that case that you were being asked to dismiss?

A.   Yeah, she knew I was upset, and then Ron Caglione, who was also trying to help me, he said,

hey, you know, you got no choice here.  These guys didn't do their job, and you're getting stuck with the bills and the sanctions and the legal fees and everything else, just like what you're trying to do.

Q.  And she told you once again that you had no choice; is that right?

A.  Well, you're going to have to come up with a god-awful amount of money to pay all these guys that had . . .

Q.  Did she tell you, you have no choice?

A.  Well, you know, you're a rock and a hard place.  It's like going into–

Q.  Did she tell you that?  That's my question.  Did she tell you that?

A.  Well, yeah, that I - - I really had no choice in the matter, the practicality to being pragmatic about it, that I had no funds to pay these huge fines that were going to come down the pike.

Q.  And so in open court, on the record, you agreed to a dismissal of you claims against Giatras & Webb and their law firm; right?

A.  I had to, yes.

Q.  Okay.  Did you tell the court that you were being extorted or blackmailed to do this?

A.  I don't think there would have been any sympathy or empathy from Judge Stanley.

Q.  So you did not?  You did not?

A.  It was deaf ears.

Q.  So you didn't tell Judge Stanley that?

A.  No.

Q.  Okay.  You simply said that you agreed?

A.    Uh-huh.

Q.    Yes.  She was hostile toward me.  Like I said, it was like I was being held accountable for

attorneys not doing their job.[3]

---

[3]The Court has reviewed the hearing transcript from the two cases that Plaintiff
voluntarily dismissed.  There is no indication in those transcripts that Magistrate Judge Stanley
was hostile toward Plaintiff, "chewing on [him]" like it was his fault "these guys" did not do
their job.  In 2:06cv122, Magistrate Judge Stanley stated:

> I find that to be a completely unreasonable expectation and strongly suggestive
> that Mr. Poff is in active contempt of this court, and it's totally unsatisfactory.  I
> wrote this order with great care and there is absolutely no ambiguity in the
> sentence, quote, "It is further ordered that Plaintiff, Mr. Poff, and Mr. Lance E.
> Rollo shall appear in person at both hearings . . . .  Moreover, it says, Failure to
> appear may result in imposition of sanctions in any or all of the cases, including
> the sanction of dismissal with prejudice. And if there was any question about it, I
> directed the clerk to sent notice to Mr. Poff by regular mail and certified mail,
> return receipt requested.  Now, Mr. Poff filed a lawsuit in this court.  Title 11
> suggests that when he did so, he had a good faith basis in his allegations against
> the attorneys.  This court will not be used as some kind of negotiating strategem
> or diversionary tactics or any other purpose, other than bringing a good faith
> claim against another entity.  Now, the court will issue an order to show cause as
> to Mr. Poff, and I expect him to appear before this court.  Now, apart from Mr.
> Poff's apparent disrespect for this court's orders, what say the plaintiff with
> respect to its intention to litigate this case?
>
> . . . .
>
> I also want to bring to counsel's attention Title 28, United States Code, Section
> 1927, which provides that any attorney or other person admitted to conduct cases
> in any court of the United States and so multiplies the proceedings in any case
> unreasonably and vexatiously may be required by the court to satisfy personally
> the excess costs, expenses, and attorneys fees reasonably incurred because of such
> conduct.

In this case, MJ Stanley was clearly addressing only the behavior of attorney Poff, and was
stating that he, not Plaintiff, may be held responsible for the costs, expenses and attorney fees.
Further, Defendant Rollo never moved to withdraw from the case.

The transcript from 2:06cv123 similarly shows MJ Stanley addressing only the behavior of
attorney Poff, speaking directly to Plaintiff as follows:

Id. at 316-318.[4]

The undersigned cannot help but to note that the reasons Plaintiff gave for being "blackmailed" into voluntarily dismissing his cases, was that his attorneys had not provided discovery as ordered, and he did not know that, and he was being faced with fines and sanctions. Plaintiff's actions in the case before this Court have been nearly identical to those in the cases in the Southern District of West Virginia. The undersigned does not know why that information was not produced in the prior cases. Here, however, it is abundantly clear that it is Plaintiff's own fault that documents were never produced. Months after they were requested, and after Motions to Compel were filed, his simple responses were that he did not have them. Further, the undersigned again notes that Plaintiff has a J.D. as well as an LLM, and cannot, especially after the suits dismissed in the Southern District, claim ignorance as to the rules and the necessity of following the Court's orders and schedule. Plaintiff admits he has access to PACER and therefore has no reason to be

Dr. King, you've had an opportunity to discuss your case with the lawyers, and it is your choice to dismiss with prejudice. However, this is not the way most lawyers function. Mr. Poff is not a good example of how lawyers behave. At this point, because you have chosen to dismiss your case with prejudice, I will not issue an order to show cause as to Mr. Poff requiring him to be here. However, I do not want to see him in this court again.

Magistrate Judge Stanley neither "chewed on" Plaintiff nor did she show any animosity toward attorney Rollo during the hearing.

[4]In fact, the Dismissal Orders in 2:06cv122 and 2:06cv123 (S.D.W.Va.) both state that Plaintiff filed a Motion to Dismiss, and that, "[a]fter hearing remarks by counsel for the parties, and after plaintiff was given an opportunity to consult in private with his attorneys, Plaintiff, by counsel, orally moved to dismiss this action with prejudice." The grounds for the Motions to Dismiss are that Plaintiff was "involved in on-going litigation as it relates to his employment . . . [and] that information from said litigation may, at a later date, be useful in determining the merits of the above-styled action. However, it is the desire of the Plaintiff not to proceed further with this action at this time."

unaware of the schedule or the Court's orders.

Significantly, after the Court granted Defendant's first Motion to Compel on September 3, 2010, and ordered Plaintiff to supplement his responses within two weeks of that order, counsel for Defendant moved the Court to allow Plaintiff's deposition to be delayed due to the non-receipt of discovery, until they had had the opportunity to receive and review the supplemental discovery the Court had ordered. The Court denied the request, expressly finding that the deposition should take place as scheduled, if only for the reason that Defendant may be able to obtain any information at all from Plaintiff. The Court expressly permitted Defendant to request a second deposition should the first not elicit the information he required.

As a further sign of bad faith, Plaintiff had not supplemented his responses, as ordered by the Court, by the date ordered, or even before the deposition. At about 5:00 pm on the date of the deposition, the following took place between counsel:

Mr. LaCagnin: It is clear we're not going to finish today, and we still have records that we're going to need produced to us.

Mr. Schillace:          You have one day, seven hours.

Mr. LaCagnin: Well, that's your opinion. I disagree.

Mr. Schillace: Those are the rules.

Mr. LaCagnin: And I am going to make the record on it.

Witness:       Let's keep going.

Mr. LaCagnin: I will tell you what. Let's get through the underlying claims, and then we are going to come back, and we're going to depose you on the records that you were supposed to give to us

before this deposition, which we asked for and which you did not, and we will be happy to let the court decide that issue.

Mr. Schillace: It's 5:15 by my count. You've got 45 more minutes.

Mr. LaCagnin: Well, you're going to cut it off in 45 more minutes is what you're saying, and that's fine, and then we'll go before the court and we'll argue it.

Mr. Schillace: That's what the rules provide.

Mr. LaCagnin. Well, that's what the rules provide when you have got somebody who is cooperating with the litigation.

Witness: You burned I don't know how much time - -

Mr. Hart: Shhhh.

Witness: – on irrelevant data.

At the conclusion of the deposition time, the following took place:

Mr. LaCagnin: We are done for the day. We intend to reserve our right to continue this deposition for the purpose of questioning this deponent regarding records which have not been produced to us after having been requested in sufficient time before this deposition, and also due to the fact that a large amount of time in this deposition was spent trying to get the witness to answer questions, so that I was forced to repeat questions over and over and over again, until we finally got answers or some semblance of an answer. So you can expect that motion.

Mr. Schillace: Well, we certainly object.

Mr. Hart: Yeah, we do.

Mr. Schillace: We see that we have about twenty minutes left of the seven which you have taken

essentially all of. There was no objection received by anybody following the supplementation ordered by the court on Friday,[5] so we would object to coming back, and we're here, you can complete whatever you want to complete, but we are here for the one day, seven hours, and he will read and sign.

Mr. Hart: Yeah.

Mr. LaCagnin: I think there is sufficient record to show that this deponent hasn't been forthcoming with discovery.

---

[5] Supplemental responses to the requests for production are as follows:

| | |
|---|---|
| REQUEST NO. 9. | I have requested copies of my tax records from the IRS and state taxing authorities. I have not yet received them |
| REQUEST NO. 10. | I have recently made a request to the Internal Revenue Service and the other taxing authorities for copies of my tax returns. I will produce them as soon as I receive them. |
| REQUEST NO. 11. | I have not retained any financial statements or tax records concerning my limited liability company. I have moved many times in the past seven (7) years and each time I have thrown away or disposed of any such records that may have been in my possession. |
| REQUEST NO. 12. | I believe that I have signed that and returned that to counsel for the Defendant. |
| REQUEST No. 17. | I do not have complete court files for any of these documents. I only received a couple of items from Mr. Rollo or Mr. Poff. I have provided everything that I have with regard to those actions. Unfortunately, I cannot afford to obtain the documents that are contained in the courts. |
| REQUEST NO. 18: | I have produced everything that I have with regard to my staff privileges at Putnam General Hospital. I have moved many times since then and have disposed of any other documents that I may have had. |
| REQUEST No. 19. | I have produced all documents that I have. I do not have in my possession any other documents regarding the West Virginia Board of Osteopathy at this time. I have moved many times since then and I believe that I disposed of many of the documents that I may have had. |
| REQUEST NO. 21. | I have given everything that I have concerning my peer review file from Putnam General Hospital. |
| REQUEST No. 22. | I have attached documents pertaining to my case against LeClair Ryan, which was filed in Florida, Virginia, and West Virginia. |

The Court has reviewed the supplemental responses served on September 17 on Order of the Court. They are footnoted below. It is undisputable that Defendant would not have had the information requested by the date of the deposition, September 22, and counsel's declaration that there was "no objection" to this supplemental response is disingenuous, considering it was served on a Friday, and the deposition took place in the morning the following Wednesday. Further, the Court does not find any objection was necessary by that date. Finally, it would have been clear to counsel and to Plaintiff, who holds two law degrees, that the so-called "supplementation" added little, if anything, to the information the defendant had requested six months earlier, and represented he needed prior to the deposition.

For all the above reasons, but most significantly due to the Plaintiff's total disregard for the rules and in particular the Court's Orders in this case despite his counsel's and his own knowledge of the importance of the process in order for both parties as well as the Court to efficiently and effectively prepare for trial, the undersigned finds Plaintiff has acted in bad faith.

2) Regarding the second factor of the test, the undersigned finds Defendant has suffered a great deal of actual prejudice in that the information requested is at the very heart of the Plaintiff's case and the defendant's defense. Plaintiff brought suit, suing Defendant for legal malpractice in his handling of three separate malpractice cases against other law firms, but fails to provide any documents regarding those underlying lawsuits. He claims damages of 2.5 million dollars but fails to provide documentation of his income, efforts to obtain employment, or losses.

For example, during Defendant's deposition he was asked about his underlying claim against the law firm Steptoe & Johnson, which he alleged in the underlying claim had illegally withheld

documents that would have been in his favor in a peer review action (Exhibit B, page 45). The documents allegedly withheld included doctor referrals, MRI studies, CT scans, and failed operative procedures by other doctors. Plaintiff could not identify a single patient whose records were withheld, stating that he thought the records "had all been burned." He then explained that his accountant's office building burned to the ground. When asked if there were medical records there, he responded, "No." He then identified the accountant, but could not remember what year, between 2004 and 2006, his accountant's building had "burned to the ground." When asked if he would be willing to sign a release for Defendant to obtain any records the accountant may have, he refused. As to other records, including medical records, he then stated his wife had thrown him out of her house and there were "a whole bunch of records I never got custody of." Id. at 50.

Plaintiff has also failed, until only recently, well after Defendant filed the motion for sanctions, to even sign authorizations for Defendant to obtain the information from the lawyers, law firms, and accountant in the underlying cases. When he did finally provide several authorizations (but not all), he failed to provide addresses for all the individuals and businesses. For Angela Wier, the attorney he testified accompanied him to and counseled him at the hearings in the Southern District of West Virginia where he voluntarily dismissed his claims, he provides her address as "unknown." For Henry Walker, another attorney who he testified counseled him, he also provided an address of "unknown." Regarding releases for information from attorneys Gregory Haddad and Carl Roncaglione, Defendant's counsel themselves provided the addresses (both in West Virginia.). Those authorizations were dated January 3, 2011. Defendant, however, wrote at the end that he would appear in West Virginia (he resides in Alabama) to make the copies himself to avoid copying

costs, but would therefore "need 2 weeks notice with handicapped mother," further delaying Defendant's obtaining the information requested months ago.

For Defendant's accountant, Ray Shell, he states in his own handwriting at the end: "Defense counsel shall pay" for copying.

Notably, according to Defendant, these five authorizations were only half of those that were submitted to Plaintiff for his signature. One the Court finds especially significant is for the records of Richard Poff, who was lead counsel in the underlying cases in which Defendant acted as local counsel. Plaintiff failed to produce even one piece of correspondence between himself and attorney Poff, and then failed to submit an authorization for Defendant to obtain the information from attorney Poff himself. Counsel as well as Plaintiff himself must be aware that attorneys are not going to voluntarily produce their case files.

Even Plaintiff concedes the information is material, by informing the Court that: "The ultimate effect of these responses is that it will be more difficult for the Plaintiff to prove his case before this Court."

3) Regarding the third factor, as the Fourth Circuit found in <u>Richards</u>, the undersigned finds Plaintiff's noncompliance, especially in "ignoring the direct orders of the court with impunity" is misconduct which must obviously be deterred." <u>Id.</u> at 93. Monetary sanctions have had no effect on Plaintiff's behavior. Further, a review of the prior actions in the Southern District of West Virginia indicate a similar if not identical record of delay and disrespect for the rules and Court Orders which was clearly not deterred by the threat of sanctions in that Court.

4) Fourth, it is clear from the proceedings for the past two years, that lesser sanctions of

costs and fees had little, if any, impact on Plaintiff.  In fact, he ignored the sanctions.  Furthermore, as the Fourth Circuit did in <u>Richards</u>, the undersigned rejects other sanctions such as preclusion of claims or partial summary judgment because "without the essential discovery material, the case could be more difficult to try," not only for Defendant but for the Court.[6]

Also as in <u>Richards</u>, this Court has threatened Plaintiff with contempt and warned him numerous times, expressly and in writing, that continued noncompliance could result in dismissal of his case.  Even thereafter, Plaintiff continued to defy the authority of the Court.

The Supreme Court has instructed that this most severe sanction of dismissal  "must be available to the district court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent."  <u>National Hockey League</u>, 427 U.S. at 643, 96 S.Ct. at 2781.  The undersigned finds the case at bar is such an "appropriate case."  In <u>Richards</u>, the Fourth Circuit noted:

> Even though the defendants may have made efforts to comply, the attempts were last ditch and only offered when it became crystal clear that they were going to lose the case unless they did something.  In the context here, the things done did not add up to an adequate "something."  Entrance of default judgment against the defendants now is not punishment for their "compliance" as they would have it characterized, but an unmistakable message to them and others that the judicial system will not tolerate repeated misconduct never wholly remedied in the future.  To find otherwise would send the opposite message that the court may be pushed, ignored and defied to the outermost limits so long as the noncomplying party has even an inadequate fallback act ready in the wings should the final curtain be falling.

<u>Richards</u>, <u>supra</u> at 94.

_____

[6]Notably, the court found that the defendant in <u>Richards</u> "had yet to pay the costs and attorney's fees awarded to Mutual."  Fn. 15.

The Supreme Court in <u>National Hockey League</u> held:

> The District Court was extremely patient in its efforts to allow the respondents ample time to comply with its discovery orders. Not only did respondents fail to file their responses on time, but the responses which they ultimately did file were found by the District Court to be grossly inadequate.

427 U.S. at 642, 96 S.Ct. at 2780.

In <u>Richards</u>, the Fourth Circuit concluded:

> In this case, Magistrate Conrad had to tolerate approximately 13 months of subterfuge and direct defiance of his authority. It has been the defendants' practice from the very beginning to ignore outright the court's orders or to submit chaotically and defectively to them.

> The facts of the case speak so clearly as to R&A's egregious misconduct that we are confident that the district court did not abuse its discretion.

The undersigned finds this case perhaps more egregious than <u>Richards</u> for the simple fact that it is the Plaintiff, who bears the burden of proof, who has denied Defendant a fair opportunity to defend himself against the allegations. Defendant has been forced to expend time and money not only to defend himself, as any litigant must, but to simply obtain information he requires to defend himself. Moreover, the information sought is some of the same information Plaintiff would have to produce at trial in order to prevail. Plaintiff's failure to produce that information is therefore all the more inexplicable. Further, in this case, the Court has had to tolerate at least 16 months of subterfuge and direct defiance of its authority (going back to the District Judge's first finding that Plaintiff had not complied with its orders). "It has been the [plaintiff's] practice from the very beginning to ignore outright the court's orders or to submit chaotically and defectively to them." <u>Richards</u>, <u>supra</u>, at 94.

"The facts of the case speak so clearly as to [Plaintiff's] egregious misconduct" that the undersigned "is confident" in recommending to the District Court the ultimate sanction of dismissal.

## RECOMMENDATION

For all the above reasons, the undersigned United States Magistrate Judge respectfully **RECOMMENDS** Defendant's "Motion for Sanctions to Address Plaintiff's Failure to Comply with Prior Discovery Orders" [Docket Entry 64] be **GRANTED**, and Plaintiff's case be **DISMISSED** as a sanction for such continued and egregious noncompliance.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to send a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this 28th day of January, 2011.

s/ John S. Kaull

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE